OPINION. Van Fossan, Jvdge: The first question to be considered is whether the repayments in 1942, of $2,150,000 on contract No. W-OKD-481, $633,583.05 on contract No. 478 ORD-3, and $1,971,111.52 on contract No. 478 ORD-40, of moneys received by petitioner from the Government under the respective contracts entitle it to a credit for debt retirement under section 783 of the Internal Revenue Code. The determination of this question is dependent upon whether the advance payments constituted an “indebtedness” within the meaning of section 783 (d), which is as follows: (d) Definition of Indebtedness. — For the purposes of this section the term “indebtedness” means any indebtedness of the taxpayer or for which the taxpayer is liable evidenced by a bond, note, debenture, bill of exchange, certificate, or other evidence of indebtedness, mortgage or deed of trust. A similar question was considered in Gould & Eberhardt, Inc., 9 T. C. 455. In that case the taxpayer obtained from Defense Plant Corporation, an instrumentality of the United States, six purchase orders for an equipment pool of machine tools. Pursuant to the terms of the orders, Defense Plant Corporation advanced to taxpayer 30 per cent of the total purchase price. Upon sale of the tools to substituted purchasers taxpayer returned the advances to Defense Plant Corporation. It claimed that the advances constituted borrowed capital for the purpose of computing its excess profits credit and it also claimed a credit for debt retirement on the ground that the repayments of the advances constituted a reduction of indebtedness. This Court held that the advance payments did not constitute an indebtedness within the meaning of section 719 (a) (1) and that the repayment thereof did not constitute a reduction of indebtedness within the meaning of section 783 (d). In seeking to distinguish Gould & Eberhardt, Inc., supra, petitioner states on brief, in part, as follows: The Court in deciding that case followed the Canister [7 T. C. 967] and West Construction Co. [7 T .C. 974] decisions and held that no indebtedness had been shown under § 719. The Court then concluded by holding (what necessarily followed) that no indebtedness had been shown under § 783. A review of the record in that case, he wever, shows no evidence, such as is found herein, to the effect that the parties intended the advances to be loans or indebtedness * * *. Herein the petitioner did not claim or report the advance payments received by it as borrowed capital. While its action in this respect is not determinative, it does indicate that petitioner did not regard the advances as “borrowed capital,” i. e., as “outstanding indebtedness” under section 719 (a) (1). With respect to contract No. W-ORD-481, there is no evidence to the effect that the parties intended the advance payments to be loans to or indebtedness of the petitioner. Negotiations between petitioner’s counsel and the legal advisor to the Chief of Ordnance, claimed by petitioner as showing such intendment, pertained only to contracts Nos. DA W 478 ORD-3 and ORD-40. Counsel for petitioner did not regard the advance payments as loans to or indebtedness of petitioner. On the contrary, in his reply to the legal advisor to the Chief of Ordnance, who had stated that he viewed an advance as being “in the nature of a loan,” petitioner’s counsel stated: I am afraid that where your line of reasoning and mine come to a sharp divergence is in your thought that the advance, so far as these contracts are concerned, is or could in any way be construed as a “loan”. These advances are for the express purpose of carrying these operations through to the point where the contractor begins to be remunerated. * * *. The discussion of counsel related to the provision in the form of Government contract requiring the payment to the Government upon termination of the contract of the unliquidated balance of advance payments, if any, in the special bank account. This provision was required as security to the Government for the advance payments. Upon termination of the contract the purpose for which the advances were made ceased. The purpose was to finance the purchase by the contractor of materials required for the performance of the contract and to reimburse the contractor for pay rolls and other expenses for which otherwise the contractor would have had to borrow money for the purpose of the contract. With the termination of the contract operations thereunder ceased. The contractor was amply protected as to payment. Under the principal contract the Government agreed to pay the contractor the contract price for all completed supplies and also to reimburse him for all expenditures made, including overhead, as well as for outstanding obligations or commitments which had been incurred, with respect to the uncompleted portion of the contract. In addition, he was to receive a sum, as a profit on the uncompleted portion, computed as provided in the contract. Here, as in Gould & Eberhardt, Inc., supra, the advances were payments against the purchase or contract price. Under the contracts liquidation of any advance payment was made by means of deductions of 30 per cent of the contract price of completed articles delivered. Upon termination or completion of the contract, the unliquidated balance of advance payments, if any, was deductible from payments otherwise due the contractor. The contractor was required to repay to the Government any unliquidated balance of advance payments only in the event the sum due the contractor was insufficient to cover such balance, and then only to the extent of the excess over the amount due the contractor. This amounts at most to a requirement of a return of an overpayment of the purchase or contract price. Moreover, article 4 of Supplement No. 2 of both contracts Nos. 478-OKD-3 and ORD-40 provides that if and when the contractor has reimbursed the Government in full for the advance payments any money remaining in the special bank account or accounts “shall become the property of the” contractor. Thus the moneys in the special bank accounts were not considered by the parties as the property of the contractor until full reimbursement by way of credit against invoices of the advance payments to the Government. What was stated in Canister Co., 7 T. C. 967; affd. (CCA-3), 164 Fed. (2) 579 (certiorari denied, 333 U. S. 874), is equally apposite herein, as follows: The contracts In question called for the payment of prices by the Government for articles delivered by the contractor. The contractor’s obligation was to make and deliver the goods. The Government’s obligation was to pay money for the goods, and that obligation included an agreement by the Government to pay not more than 30 per cent of the total contract price in advance. By the terms of the contract the payments with which we are concerned were advance payments under the contract, and not loans. The Western contract with respect to which the advance payments were made was a cost-plus-a-fixed-fee contract. By it the Government was obligated to pay a fixed fee for services and to reimburse Western for the cost of certain equipment and installation thereof in the St. Louis Ordnance plant. The Government was obligated to advance, at the request of Western, not to exceed 30 per cent of the cost of the work and equipment, title to which was to vest in the Government and it assuming all risk incident to ownership. When the reimbursements and advance payments equaled the cost, no further reimbursements to Western were required to be made by the Government. Thereafter reimbursement vouchers were applied in liquidation of the advance payments. However, the contractor could, as Western did, pay the advances by check instead of following the above procedure. Clearly, under this contract, the advance payments were advance payments as designated and not loans. The advance payments under the three contracts as supplemented, therefore, did not constitute an indebtedness of petitioner under section 783 (d). In that view it is not necessary to determine whether the contract and request for advance payments, voucher, and acknowledgment of receipt thereof constituted, as argued by petitioner, a “certificate, or other evidence of indebtedness” under section 783 (d). Petitioner is not entitled to the claimed credit for debt retirement under section 783. The next issue to be considered arose out of affirmative allegations of the respondent. In computing the deficiency herein the Commissioner allowed a deduction of $572,876.13 for accrued State of Connecticut income taxes for 1942. However, he now claims that the allowance of the deduction in that amount was erroneous in view of the renegotiation agreement and other adjustments and that the amount allowed was overstated by not less than $318,629.08. The petitioner contends that its tax liability for 1942 is determinable on the facts as they existed on December 31,1942, that the renegotiation agreement was not signed until 1944, that adjustment of its state income tax liability is still pending and it is questionable whether it will receive a refund, and that any adjustment thereof should be reflected in the taxable year when made. The petitioner paid Connecticut income tax in the amount of $562,213.71 as disclosed by its 1942 state income tax return. In such return the income' attributable to doing business in Connecticut was reported on a separate basis as if Winchester was operating on a separate basis instead of following the usual method of allocation based on the total over-all net income of petitioner. In such return petitioner also reserved the right to file an amended return upon completion of pending renegotiation of its income due to Government contracts. After the renegotiation agreement was signed petitioner, in September 1944, filed an amended state income tax return wherein it represented that its income attributable to Winchester had been overstated by $16,077,852.10. It also filed a claim for refund in the amount of $320,738.30. No action has been taken by the state tax authorities upon petitioner’s claim for refund or with respect to the method of allocation of its income attributable to Winchester. Action will not be taken until receipt of notice of final determination of the taxable net income of petitioner for Federal income tax purposes. In Chestnut Securities Co. v. United States, 62 Fed. Supp. 574, it is stated as follows: * * * One is not entitled to accrue a debt or other liability which is asserted against him but which he disputes and litigates, until the litigation is concluded. But if a liability is asserted against him and he pays it, though under protest, and though he promptly begins litigation to get the money back, the status of the liability is that it has been discharged by payment. It is hardly conceivable that a liability asserted against him, which he has discharged by payment,' has not yet “accrued” within the meaning of the tax laws and the terminology of accounting. Accrual, from the debtor’s standpoint, precedes payment, and does not survive it In that case the taxpayer in 1940 paid additional income taxes for the years 1936, 1937, and 1938 asserted by the Oklahoma Tax Commission, plus interest, and at the same time gave notice of its intention to sue for their recovery. Suit was instituted. A trial was had and j udgment entered in favor of the tax commission. Taxpayer appealed and in January 1942 the Circuit Court of Appeals for the Tenth Circuit affirmed the judgment of the District Court. The Supreme Court of the United States denied certiorari on April 13,1942. In its 1940 Federal income tax return, taxpayer deducted the Oklahoma additional income taxes paid for 1936, 1937, and 1938, which deduction was disallowed. On May 29,1942, a deficiency notice was addressed to the taxpayer. The taxpayer paid the additional income tax therein asserted, plus interest, and on December 27, 1942, filed a claim for refund, claiming therein that the $5,564.03 Oklahoma income tax and the $577.38 interest thereon paid to the State of Oklahoma during 1940 were proper deductions in computing its taxable income for 1940. In our opinion, the rule of the above case is applicable herein. It is in accord with G. C. M. 25298, C. B. 1947-2, p. 39, wherein it is stated, in part, as follows: As to contested deficiencies of tax which have been paid to the taxing authorities, though the contest of liability is continued by the taxpayer by the filing of a claim for refund and a suit in court for the recovery thereof this office is of the opinion that such deficiencies must be held to be deductible not later than the time of payment. (See Chestnut Securities Co. v. United States, 62 Fed. Supp. 674). The accrual basis of accounting for liability items relates to deducti-bility of items which are unpaid. (Cf. Dixie Pine Products Co. v. Commissioner, supra.) [320 U. S. 616.] See also Gibson Products Co., 8 T. C. 654. The petitioner is entitled to the deduction for Connecticut income taxes for 1942, but only in the amount paid. In its assignment of errors on the part of the Commissioner, the petitioner alleged that in arriving at the deficiency in excess profits tax of $2,997,824.72, he had erred in failing to give petitioner a credit for a payment of $1,119,594.43 made by petitioner on February 1, 1945, prior to the date on which the deficiency notice was mailed. The amount of $1,119,594.43 consists of cash of $1,099,473.72 and off-set of $20,120.71, overassessment of income tax. This was denied by the respondent. However, respondent admitted in his answer that on December 29, 1944, petitioner executed Treasury Department Form 874 and therein consented to the assessment and collection of an additional excess profits tax of $1,119,594.43, that on or about February 3, 1945, petitioner paid to the collector at Springfield, Illinois, additional excess profits tax of $1,099,473.72 and $123,690.79 interest, and that respondent had not given credit for the payment in arriving at the deficiency in excess profits tax. In his reply brief, respondent states as follows: The additional tax covered by the Form 874 and the deposit with the Collector prior to issuance of the statutory notice have since been assessed and the petitioner will have due credit therefor, as well as for payments made since the deficiency notice was mailed in the computation under Rule 60. There is nothing for the Court to decide at this time. The respondent’s statement disposes of this issue. Decision will be entered under Bide 60.